Okay. Now we'll hear our first case of the day. It is Handel v. Innovative Industrial Properties No. 24-2829. And, Mr. Goldberg, we will be happy to hear from you. Are you reserving any time? I am, Your Honor. Thank you. I'm reserving three minutes. Okay. That will be granted. May it please the Court. OVIA stands squarely for the proposition that within a limited temporal frame, a senior executive responds to a pointed question about an important matter, denying with certainty the adverse impact of that matter, that the inference of scienter is at least as compelling as the non-culpable inference. So you're not arguing in the core operations theory, though, are you? We – there are – It's kind of a yes or a no. We have not argued core operations. However, Judge McKee, one of the things that our friends have said is that this is not about the core because it's about Kings Garden, which is one of several tenants. But what we have argued, and very strenuously with respect to OVIA, is that the core operations of this company are vetting, verifying, and monitoring. That's all they do. And then they collect rent. And if they can't collect rent, they cannot make good on the promise to their investors of returning dividends, which REITs must do at 90 percent. Let me ask you a couple of questions about that. So I'm trying to figure out why OVIA isn't distinguishable. You – looking at that Blue Orca report, it doesn't say anything about the reimbursements, Kings Garden's reimbursements. Why in the world is this like the very pointed questions that you got from InnoVIA? So what – Judge Montgomery reads, what the Blue Orca report does is, with great specificity, with far greater specificity than the questions at issue in OVIA from the analysts, says there are problems with two tenants, in fact, IIPR's largest two tenants. Both of those tenants are credibly and publicly in filings accused of fraud, one that ended up being a Ponzi scheme, Kings Garden, and the other, which someone had accused of being a Ponzi scheme already. And what Blue Orca is doing is it's saying, in the context of this particular industry, where it is very difficult to find new operators, where licensure is very important, default is critical, and these two tenants look like they are prime candidates to default. In response to that, Ms. Hastings, in a press release, says, don't pay attention to this report. You're right, it's not about verification. So we have to pay attention. Can I – I want to get to a little bit – I'm sorry, I know you have a couple of questions, but since you mentioned it, you say Ms. Hastings said. I didn't see a quote from Ms. Hastings. I saw at the end of it, it said, here's your contact. Would we be saying the same thing? Would she be liable if it said, call the press guy at the firm? She would, as the person who crafted the statement. But what's important here, Judge Shigaris, is that Ms. Hastings is the contact about what they're talking about, which is verification. Remember, please, that she is the CFO, and she is the person who approves all draw requests. She's in charge of the construction. I suppose, but it seems like there might be an analytical step missing, where just because she's at the bottom as the contact, you're imputing everything said to her. Would it be the same if it was just the press person? You would say, she said all these things. I wouldn't say, I wouldn't say in that instance that she said those things because she wouldn't have. She being the press person? Forgive me, no. Ms. Hastings. She's the person because she is the contact? Yes, absolutely. In other words, in other words, if you have questions about verification or about our response to the report, contact Ms. Hastings. So in Chief Judge Shigaris's question, then, you would say the press person is the person to whom we should attribute the statement if the press person was the contact name? If the press person was the contact name, then I would not be saying that it was Ms. Hastings, but. That might come as a surprise to press people. Well, but not really because we're talking about scienter here. And the question is not, the question is who made the statement? She is a maker of this statement, and she is the person whom investors are to call to discuss. What is the statement?  How do you get scienter from that? We get scienter because, as I was saying, Judge McKee, about Avaya, when there is a pointed question and a denial with certainty, followed by another denial with certainty, followed in close proximity, temporal proximity, with a revelation of the problem, that, this court has said, is scienter because, even if the defendants don't know, the risk of misleading is great. So let me walk you through that. In Avaya, as I understand it, the question is, are you reducing the prices? The answer is, no. The next question is, are you reducing the prices? The answer is, no. I told you no. And a couple days later, the question is, are you reducing the prices? And the answer is, no. And then a couple days later, it's, oh, my goodness, we didn't meet our numbers. Because we reduced the prices. Here, as I understand the Blue Walker report, at least as it relates to King Garden, I know there is another tenant. And as it relates to the other tenant, there are questions about whether or not they'll be able to make their rents because there are all sorts of questions. And also, with respect to those other tenants, as I remember, I think I remember, there were questions about the reimbursements. I didn't see issues about King's Garden's reimbursements. And you tell me if I missed them. What I saw is Michael King is a fraudster. Let me tell you how. My question for you is, how is Michael King is a fraudster a pointed question about the reimbursements, which is what I understand your lawsuit to be about? No. Our lawsuit is not solely about reimbursements. Reimbursements are one issue. Remember, our lawsuit is also about due diligence and also about praising King's Garden. Well, I understand that, but the injury is the reimbursements. No, the injury is default, Judge Montgomery reads. The injury is default. The reimbursements were – King's Garden took the reimbursements and distributed them in places where they shouldn't and did not build as they promised. That's one element of this. Bill, can you answer your argument about the dividends, which I don't understand why the payment of dividends would be such a red flag that you seem to suggest that it is.  So, Judge McKee, the dividend is a red flag because no other operator in this industry is paying one. It could be both ways. You could argue that this company is particularly forward-looking and they're taking care of their investors by putting some of the profits being paid in the form of dividends to stockholders. But then why is IIPR lending money, Judge McKee? The point of IIPR is – and Blue Orchestra says it colloquially. They say this is a marijuana bank. Marijuana operators cannot borrow from federal banks, so they need capital. So where do they go? They go to IIPR, engage in a sale-leaseback transaction. The whole point of that is to put the money back into the business so they can expand and distribute and do the things that businesses need to do. The point about the dividend – and I'm not sure it's a huge point and it's not our most important point. The point is if money is going out of Kings Garden, that should cause the defendants to redouble their efforts, redouble their efforts to ensure that they verify draw requests. But then you're – even conceding that, it seems to me that focus is more on negligence than on the kind of answer you need to show under 10b-5. Well, so the dividend is a red flag. Red flags are things that should – You're saying that put them on inquiry notice. Absolutely. And then the question is – and I think the second question is what is the inquiry they should have done? Well, they promised to visit sites. And when Ms. Hastings – Did they promise to – so take me to that exact quote, the entire quote. Sure, sure. Innovative, evaluates – forgive me, I'm sorry. What page is that? So it's in the complaint and it is absolutely one of the – I can read it to you and then find the exact location. Innovative evaluates the credit quality of our tenants and any guarantors on an ongoing basis by reviewing where available the publicly filed financial reports, press releases, and other publicly available industry information regarding our tenants and any guarantors and monitors tenants by periodically conducting site visits. And monitors tenants by periodically – there's an ellipsis there. What's the ellipsis? No, no. And monitor tenants by periodically conducting – forgive me, I'm reading from defendant's brief and I'm trying – It's on page 53 of the complaint, paragraph 134. Thank you, Judge McKee. With respect to risk management – Paragraph 134 on appendix 104. With respect to risk management, we evaluate the credit quality of our tenants and our guarantors on an ongoing basis by reviewing where available the publicly filed financial reports, press releases, and other publicly available industry information regarding our tenants. Defendants continue that. In addition, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations. I think it says in some instances. I think what's ellipsed out of there is in some instances we monitor our tenants. Well, so then the question becomes monitor versus site visits. And here's what we know, Judge Montgomery-Reeves, because they tell us. So Ms. Hastings says on April 14th, we verify. What year? Of 2022, Judge Montgomery-Reeves. After Blue Orca. Same day as the Blue Orca report. The same day as the Blue Orca report. 21 days later, with time to investigate, and this is – sorry, trying to segue back to your point, Judge Montgomery-Reeves. With 21 days to investigate what Blue Orca said, which wasn't just about Michael King. It was also about Kings Garden. The Swiss-American lawsuit is about money leaving Kings Garden, probably to Michael King. He's a member. So effectively, they double down on May 5th. Mr. Gold says, we are convening a conference call unusually. This is unscheduled. We usually do it every other quarter. We weren't supposed to do it until August, but we want to talk to you. What did we want to talk to you about? Parallel in Kings Garden. What do we want to say about parallel in Kings Garden? I'll get into due diligence. We want to say, this is the due diligence we say. Mr. Reagan says, my friends have said, there's no public disclosure that we do due diligence into management. Mr. Reagan says on May 5th, we do an in-depth review of the management team. Belying their entire due diligence argument. And then Ms. Hastings comes on. And she says, she summarizes, this is I think page 316. She summarizes the verification process. And in summarizing the verification process, she refers to Mr. Markert, who has spoken at the May 5th call about Kings Garden's projects. And she says, we engage with architects. We engage with contractors. We do site visits. So we know that this is part of the verification process. Do they do other site visits? It's likely they should. Because again, Judge Montgomery Reeves, in response to Judge McKee's question, what this is, verification, vetting, verification, and monitoring, is their core business. That's what they do. They have to figure out if the tenant is worthy. They have to monitor the tenant to ensure that the tenant is doing the business and improving the properties as promised with the cash that IIPR invests. And then they collect rent. That's it. Everything you're arguing, though, suggests that if you are right, you're only right if we look at the class period as of April 14, 22, and not as early as your complaint alleges. Well, so what does April through May tell us? So in April, the response— April of 22? April of 22. Forgive me. Did I say? When I say April through May, I'm going to be talking about 2022 and not 2020 or 24. What does it tell us? Blue Orca told the truth. They dug, not particularly deeply, where Kings Garden—forgive me, where IIPR did not dig, and they found this information. There is no question, Judge McKee, that Kings Garden was a Ponzi scheme from before the first investment. The Swiss American complaint is January of 2019. The first sale leaseback is April. So effectively, what is April to May? It's a reflexive denial when they did not verify. And then in May, they're talking about parallel in Kings Garden. One could imagine analysts and investors calling the company and saying, hey, your response to that report wasn't very good. So three weeks, with time to investigate every draw request. Remember, it only took them two weeks to find out that one was false and the whole thing— How did they find out? Apparently the signatures, are that obviously fraudulent? Well, Judge McKee, some signatures were missing. We only have two draw requests and an invoice. And all of those are incomplete or seemingly on their face. The text, the boxes are— Boxes are different at all, you said? They are. They are. And this is our friend's allegation, not— This is what they say in their complaint against Innovate. And I want to say this is very important. The defendants have said all we've done is, this is fraud by hindsight, this is conclusory. It's not. As this court said in Avaya, there are two ways to demonstrate scienter. One is through documents, and the other is through personal testimony, confidential sources, as we often plead them. In that case, by the way, the confidential sources had nothing to do with the scienter analysis, only falsity. But in this case, we don't simply say they had access generally to information. We point to the information and to certain documents. For example, the November draw request that they reproduced, they also produced the last one, but they produced, Judge McKee, a draw request for November of 2021. It's missing the architect's signature. But wait. In May of 2022, when Ms. Hastings speaks as the head of the construction team, she says we engage with architects. No call. No phone call. With respect to Kings Garden, they didn't visit to check on improvements, and this is in their complaint, until after June 16th, when, by the way, they call Mr. LaSalle, and he does not protest. He says, yeah, I forged it. He gives up the ghost to them immediately. And the interesting thing about that is, in the Swiss-American lawsuit, Kings Garden actually produced the financial statements to Swiss-American. And Swiss-American was like, that looks really weird. Kings Garden is not hiding that it is a fraudster, seemingly. You just have to ask. And no one did. But Ms. Hastings, in that conference call, again, Judge Montgomery reads three weeks after denying, by saying we verify. Three weeks. She's there saying, look how robust our verification process is. They simply didn't do it. And I'd like to bring up Hayes versus Gross for a minute, because there's this notion of mismanagement versus fraud. And I think the Supreme Court's recent McQuarrie case helps with this. I think basically what the Supreme Court said is, there's no more pure omissions cases. Cases under 10b have to be misrepresentations. You could omit a fact that created a misrepresentation. In Hayes versus Gross, mismanagement becomes irrelevant. The question is, as this court wrote in Hayes, the question is, did the material public statement about, did the corporation and the defendants make a material public statement about the state of corporate affairs inconsistent with the existence of mismanagement? So the question is, very simply stated, there's no question that due diligence, that vetting of tenants is core to this company. It's what they do. Did they do it? They did not with King's Garden. There's no question that site visits to ensure that you are monitoring your tenants and that they're doing what they have to do, right? That is a risk mitigation technique. There's no question that that is a very important thing that this, that IIPR does. Garden is about 10% of the portfolio. Is that right? It is 10% of the portfolio. If they did it with, let's say, most if not all of the other entities, but failed to do it with King's Garden, would that still support a core concept argument? So I want to separate two things. I think it does separate core because, again, this is about, we don't know one way or another what they did with any other tenant. We can surmise, but that's all we would be doing. All we know is King's Garden. I'd like to separate the core operations from the Avaya issue. As Judge Payden ruled, King's Garden is important. It's the second largest tenant. It's 10%. They've been praising King's Garden up and down, and she found that false because it was a Ponzi scheme. So there is, the core part of that judgment key is, did they do the due diligence? Did they vet? And the answer to that clearly is they did not, and their own allegations say that. Not until after June 16th did we do certain things. For example, not until after June 16th did we look into Mr. King's background. Unbeknownst to us, they say, Mr. King is a fraudster. Well, that's important, and remember on May 5th, Mr. Reagan says, we do an in-depth review of management. Well, they said they're relying on the California licensing protection. That's what they did. That's what they did. They did not even look for lawsuits for the principals and the tenant itself. Then you get into whether or not that gets to the law. So I just want to make sure. So one of their disclosures said, you know, you've read it just a few minutes ago about all the things they look into, one of which is publicly available industry information. I assume it's your position that one piece of publicly available industry information would be these complaints? Yes. Okay. Of course, yes. And then, remind me, what court was the complaint filed in? There are two complaints. There's a Swiss. The Swiss-American. Both were in California. The Swiss-American was Superior Court. Forgive me, I don't remember the county. There were state court cases, right? I think that Mr. King's brother, Paul King, who sued him for fraud, that may have been federal, but forgive me, we certainly can look to the Blue Orca. That's okay. I was just trying to, you know, think about it and think about what we are essentially saying. Are we saying that if you, if this company says we look at publicly available industry information, they have an obligation to look for complaints in every state court in all 50 states? Let me refer you to the Baer case for that. In the Baer case, they did due diligence. But what they didn't do was look into the one issue that Malincroft, the acquiree, they didn't, forgive me, it wasn't Malincroft, forgive me, they didn't look into one of the issues that the acquiree had big legal problems, billion-dollar legal problems. And the court found that your failure to look at that means you didn't do the due diligence you were supposed to do. Some of that information is public. But if I may, any due diligence into a company should include, there's no question, should include a lawsuit search. And then what Judge Payden below did and what the defendants have argued is they've said, but the resolution of that lawsuit wasn't public. Judge Montgomery-Reeves, the whole point of due diligence is to look someone in the eye and say, what happened there? So what we're trying to figure out, Judge McKee asked this question a minute ago. And he basically said, where's the line between negligence and recklessness? So what I hear is they were bad at this, right? This due diligence was absolutely terrible. Is it negligence or is it recklessness? What gets us into this recklessness camp? Right. So particularly before the Blue Orca report. Sure. When you, let's look to the Hayes case. When you choose to speak about a matter, we did due diligence. Failing to do diligence about a tenant whom you're praising is at least reckless. So that's a failure to do due diligence as opposed to not doing it well enough. Well, so what we know, for example, is, again, our friends based their entire argument about due diligence on the fact that they never said that they investigated the management teams. When on May 5th, they absolutely said that. On August 5th, 2021, they absolutely said that they do an in-depth review of management teams. Was that about the two new tenants that they were taking on in August? So what is there to suggest that that's about King Garden? That spoke specifically about young, new companies. Tell me what's wrong with what I just said. Thank you, Judge Montgomery. What Mr. Gold says is tenants like these. Like the two he had just talked about. Yes. All tenants are new. Remember that King's Garden didn't have a license until 2019, just before the first transaction. So we don't exactly know what Mr. Gold was talking about. Then I refer you, please, to this May 5th transcript on page 311 and 313. And then an analyst asked Mr. Gold, are you really doing all this monitoring and vetting? I understand what you're saying about the April after the Blue Orca report, but I'm asking about before the Blue Orca report. So what we learned in June is that unbeknownst to us, Mr. King is a fraudster. They clearly assume the obligation to do an in-depth review of the management team. Therefore, not doing an in-depth review of the management team is reckless because you don't know what the management team is. Not investigating the Swiss Garden complaint by saying to the defendants, we need everything about that, everything nonpublic. We need to speak to Swiss Garden. No, you may not speak to Swiss Garden. Well, then we're not investing. Let me ask you another question. So on page 22 of your opening brief, you talk about the Novak case from the Second Circuit, and other circuits have adopted sort of this willful ignorance, I'm going to call it, standard. I assume you're suggesting that we should adopt that here. I think you have. As sort of a way to show recklessness. Yeah, I think you have. Willful blindness is recklessness. There's no doubt about it. So if you say we are doing due diligence, and let me contextualize this just a little bit more. The Hertz case, for example, as we note in our brief, Hertz has 36,000 employees. What an accounting person at L3 did may have made its way up, but you have to be able to show how it made its way up to the speakers. Here, there are 18 employees, and the four defendants are the ones who are most involved in vetting, verifying, and monitoring. But even if, but even if, and we argued this, and Judge Payden rejected it, even if you find that none of these four defendants individually are responsible, in Rahman, this case, forgive me, in Rahman, this court set aside the argument about corporate scienter, which is different than core operations, Judge McKee. Corporate scienter. Right, so Judge Salas wrote the cognizant opinion, a very long opinion in which she thoroughly lays out the difference. Of course it's not binding on us. No, no, of course not, of course. But it suggests the different means by which other courts, 6th, 5th, 11th, have addressed the corporate scienter doctrine. Now, have you forfeited corporate scienter, though? You didn't raise it in your opening brief, did you? No, we did raise it in our opening brief. The defendants are silent on it. We point that out in our reply. Judge Payden said, I'm not attributing scienter to anyone else. But again, keep in mind, context is key. And I'm talking before April 14th, because after April 14th, 2022, Avaya applies, and this court should reverse. Because these denials are forceful, and they're denials in response to April 14th. Say that again, after when? Forgive me. After April 14th, 2022. After the Blue Oak response. Through the end of the class period, Avaya counsels reversal. Before that, though, and I'm talking about corporate scienter here, and I'm happy to talk about anything else. Well, I'd like to talk about that, because I only saw it in a footnote at the very end of your reply brief, and even then it wasn't very well developed. Well, so we develop in our opening brief that very point, also in a footnote, because Judge Payden had rejected it. So I'll refer you to page 30 of our opening brief, Judge Chigares. Okay. And it's footnote 15, and in it we say the court will impute the individual defendant's scienter to IIPR. And then. You've got to dig to find even those words. It's in a footnote. No, well, I do understand that, but we're talking about waiver, and I don't think we've waived this. I don't think we waived it below. Judge Payden. Well, it's forfeited. There's a difference, but okay. Well, forgive me. Judge Payden, this is in Judge Payden's opinion. She addressed the issue. We then addressed the issue. It's not our primary issue, but it certainly is a means by which this court, because there are only 18 defendants. So, for example, we know who Griffin Marquardt is. He was supposed to have visited places and clearly did not based on our friend's allegation. But if you're right about that, how would we draw the line? There's clearly a difference between Hertz and IIPR, but what's the rule that would be effective? How do you draw the line in a public center? Judge McKee, this is why I point to you, as Judge Shigera says, cognizant is not binding. But what Judge Salas does is she goes through and she details the way different circuits have dealt with corporate Sienter. And the most difficult standard, she recounts, is the Fifth and the Eleventh Circuits, which is did someone with Sienter furnish information? The person who was supposed to do due diligence, which, by the way, is Mr. Reagan, the person who's supposed to do due diligence, who did not do due diligence, was reckless for not doing the due diligence, and therefore the corporation is responsible. Isn't this something that should have been developed in your briefs? We were talking about it as like a phrase that we're all looking at. I understand what Judge Padin did, but, I mean, this seems like a pretty big legal point. Also, why isn't imputing a specific – if you have a person who speaks and then there's a person behind them who directed them to speak, why isn't that different than corporate Sienter? Are those two synonymous? Are those the same thing? Forgive me. Let me be clear. Assume that the Supreme Court in Janus has said that only makers can be culpable for statements. A non-maker cannot be culpable. But what if the maker has no Sienter? There's still a corporation. And so the question that courts have wrestled with is, when can the corporation itself be liable, even if the speakers, even if the complaint cannot plead Sienter with respect to the makers of the statements? And what the courts have developed is various things. But, again, the most difficult standard is, have you shown that a person with Sienter, reckless or knowledge, furnished information directly to the maker and that the maker then spoke? So, for example, Mr. Reagan is supposed to do due diligence. He, in fact, is a speaker and a defendant. But assume for a second he wasn't. If Mr. Reagan is supposed to do due diligence but does not do due diligence, he knows he did not do what he was supposed to do. Now, Mr. Smithers and Ms. Hastings, who certify the SEC reports, they certify we've conducted due diligence. That's not forward-looking. That is, for the tenants we have, we have conducted due diligence. But the corporation didn't. So you can imagine a scenario where Mr. Smithers and Ms. Hastings are unaware that the due diligence was not completed, and they certify because they think it was. But Mr. Reagan, who was supposed to do the due diligence, who didn't, either didn't tell them or did tell them, and so they make a false statement. Their due diligence statement is false with respect to Kings Garden. If we focus on – I don't want to stop this exposition. It's helpful. But if we focus on the class period starting April 14 as opposed to the way you've plotted it, do we need to then get into this, even if it's not waived? We need to get into it. Forgive me, Judge McKee. No, you do not. No. This – after April 14th, you have defendants as a whole but over Hastings' name as the contact. And then on April 14th, and then on May 5th, Judge McKee, you have Mr. Reagan making a false statement and again denying that they didn't do due diligence into the management team of Kings Garden. You have Ms. Hastings reaffirming what she said on April 14th. We verify, and here is a summary, a more robust summary of what we do. No. In there, the makers of the statements are culpable and they act with scienter under a vial. So the question is, does that bad faith that they exhibit between April 14th and May 5th carry back? With respect to due diligence, I'd like to focus on this for a second. Defendants' only argument, only argument about Mr. King is we never said we did due diligence into management teams. They say that as a matter of falsity. They say that – they repeat it for scienter. They just repeat their falsity argument in scienter. But, of course, Mr. Reagan gives up the ghost on that, Judge McKee. Mr. Reagan says we do an in-depth review of management team when he's talking specifically about Kings Garden. They did not. Is King licensed? Mr. King? Mr. King was not licensed in California. There's no federal licensing except for people doing it for experimental purposes, which we don't think he was. That's not a record. But so the defendant's only defense is we didn't say we did it with respect to Mr. King. But, of course, they did. They did on May 5th and they did on August 5th of 2021. So that's bad faith, and it ruins their argument. So this court should reverse on scienter because they haven't made an argument about why they did no due diligence into Mr. King. And, again, I don't want to repeat myself, but with respect to Swiss American, finding the lawsuit is easy. The due diligence part is saying what happened here. We want to speak to Swiss American. We want the documents that show what Swiss American categorized as troubling – characterized, forgive me – as troubling transactions. All right. We'll hear you on rebuttal, okay? Thank you so much.  And we'll hear from your friend. Morning. Morning. Stacey Obenhaus, represent the defendants, Innovative Industrial. Paul Smithers, Alan Gold, Catherine Hastings, Benjamin Rayner. I wanted to focus on scienter. I wanted to say something about the two exhibits, the first two exhibits to the plaintiff's complaint. I think they're pretty much determinative on this scienter issue. And what I want to say about them is those two exhibits, the Blue Orca report, right, and then our lawsuit against Kingsgarden. By incorporating those exhibits in their complaint, those are their allegations, okay? And so you consider, you know, it's this comparative analysis and competing inferences. And so when you consider the competing inferences that are in the complaint, what's in exhibit two, our lawsuit against Kingsgarden, is now their admissions about what happened, okay? And the same with the Blue Orca report. Let me focus on the Blue Orca report. A couple times in responding to your friend's argument, you may have gleaned that it seems to me there's a very different scenario here, depending on when we look at the class period. After the Blue Orca report on April 14, 22, the statements that were made after that report seem to me, in terms of scienter, qualitatively different, one can argue, than the statements made before. And some of those statements, particularly the May 5 statement, amounts to, and correct me if I'm wrong, praising Kingsgarden. And why, and to praise Kingsgarden is to basically say that Blue Orca is just totally wrong. And that seems to me to be a bit much, and may well get into the whole recklessness calculus. And why am I wrong about that? So, I'd say two things. One is, I think the issue in all of these cases that we're citing, these major cases, Avaya, Hertz Global, another one, Ramon, right? What did they know about fraud? What did they know about fraud? Or what should they have known about fraud? Well, I don't know about that, because if you… Well, take it not in terms of negligence, what they should have known, but in terms of recklessness, what should they have known? I know, but see, I guess what I'm questioning that is, and I hate to sidetrack your question. I go back to the Advanta decision, and then it's been repeated since then. And the language used in that decision is, they knew, or it was so obvious, they had to have known. Now, putting aside whether recklessness is the standard, which is, I guess, up in the air. Putting aside. Not challenged it. Back to Blue Orca into what you just said. Okay, so, what is the Blue Orca report? The first thing you need to look at is the first page and that disclaimer at the very top on the right. And what does it say? It says two things that I think are significant. One is, we're Blue Orca, and we have an interest in lowering the stock price of Innovative, because we have a short interest in it. So, right there, you've got just that background bias. But the first thing it says is, these are our opinions. Maybe so, but it also has screenshots of complaints with some pretty serious allegations. Okay. Every week in this country, someone gets sued for fraud. And a lot of those complaints get dismissed. This complaint got dismissed. So, as to Kingsgarden, there are two lawsuits saying they're fraudsters. This lawsuit got dismissed. Those lawsuits could get dismissed. They could have amended complaints where they dropped those allegations. But more than that, when you read what the Blue Orca report says about those lawsuits, as they said, we don't know the facts. Well, of course they don't, but the lawsuits are out there. And my question for you is, why doesn't the Blue Orca report at least notify Innovative of serious allegations against Kingsgarden CEO? Allegations which include that Kingsgarden CEO is taking money out of Kingsgarden. Why is Innovative less than willfully ignorant of the possibility that this is true? Why not investigate at that point? Why isn't there an obligation to investigate at that point? Well, maybe there is an obligation to investigate. Does it rise to the level of willful ignorance? No, because the question is, and you touched on it earlier, what do they know? Does the Blue Orca report disclose the fraud that is occurring? Right? No, but you can't put your head in the sand either, though, when somebody approaches you. I understand it's a short seller. They've got their own agenda. But as Judge Montgomery Reeves points out, there are screenshots of lawsuits. Isn't there at least some duty to say, well, maybe we should just check this out? I understand that people get sued for fraud all the time. But just to dismiss it out of hand and say, well, not our problem, not our concern. And go further and praise the subject of the allegations. Okay. Without any kind of inquiry into whether or not that praise is warranted. Okay, so duty. I'm not sure we're really talking about duty. I mean, I think I've admitted, yeah, there's kind of a duty to look into stuff. But we're talking about Santa. Did they have specific knowledge of fraud? So what is the specific knowledge of fraud on Innovative that's in the Blue Orca report? And it's kind of what you touched on earlier. What does it say about how they're doing draw requests? Sorry, about how they? How King's Garden handles its draw requests, you know? And even going further, what does the Blue Orca report say about Innovative's construction team and how they're supposed to be managing that? It says nothing about that. And this complaint says nothing about that. When you look at these other cases, like Avaya and Hertz Global, there's always pleadings about what's going on in that accounting department, for example. There's information in that accounting department about crazy stuff going on. And the question is, what do these officers and principals know about that? And that's one of the major things that's missing from the complaint. There are no allegations that this construction team knew there was crazy stuff going on and did nothing about it. Your point is, in those cases, typically there's like, here, this is a third party doing crazy stuff. Right. And no one knows. Most often what you have is there's crazy stuff going on internally, and obviously somebody knows. Maybe there's crazy stuff going on in third party, and somebody knows. Here, nothing to suggest whatsoever that anyone knew that Innovative was being defrauded. There are no pleadings that the construction team had any sense of fraud until, as our lawsuit reveals, and as they plead, as I said, in June, and this is after the Blue Orca report, the next time we get a draw, it's examined. And someone says, you know, that front page doesn't match up with this. And they start looking into it and make calls, and that's when it all falls apart. And, you know, I would say that this is like this Ramon case that we cite, where the government comes in and says, you know, your subsidiaries are dodging their duties, their import duties, and you all look into that. And they do look into it, and they disclose it. And no center, you know, because that, there was no motive. And what they did is, as soon as they got that knowledge, they looked into it and dug it out and disclosed it. And that's what you see our lawsuit showing. As soon as we had that knowledge, we dug into it. So I have two follow-up questions for you. The first one is, why is the Blue Orca report not that knowledge that you needed to go dig deeper? That's my first question. And then my second question, I want to take you to Avaya, because your friends on the other side lean on Avaya a lot. So I want you to talk about that. But the first question is, why isn't that Blue Orca report just what you were just talking about, that first little nugget that really should have been the one to say, go dig, instead of having a response on April 14th that says, everything's all good, and a response on May 5th that says, everything's all good? Okay. I think I have to go back to my prior answer. Does it show fraud against Innovative? Yeah. This guy's questionable. You know, you're in the marijuana business. Years ago, it was illegal. So you may have people that have a criminal record, right? What's a little bit more than that here? Sure. But I'm just saying, you could have that in there. I mean, there's an allegation, right, of an arrest of King. The mayor of Newark was arrested recently. But the allegation... Go there. I'm going to go right on over that. But the allegation is that money is being taken from King's Garden. Your client is relying on King's Garden to pay rent. Your client is reimbursing King's Garden for millions of dollars of capital improvements. If there are allegations that money is being siphoned from King's Garden, why isn't that the nugget that you just talked about a minute ago that should have sparked Innovative to dig, to investigate? Is it fraud on Innovative? I mean, that's... I'm coming right back to that. Your point is it has to have been a statement that there was fraud on Innovative. That's what's going on in all these cases. What's going on is internally, right, you've got all these confidential witnesses, like in Avaya, saying, here's what was going on in the accounting department. And everyone knew this. And the question is, what did those folks that talked know about that? So Avaya. Your friend on the other side has spoken a lot about Avaya and why this case is Avaya. I assume you say it's not. Why not? Well, I mean, there's a few reasons. One is that what you have in Avaya, all these confidential witnesses from the accounting department showing that there was some internal knowledge of all of these problems you do not have in our complaint here. The equivalent would be confidential witnesses from our construction team saying, yeah, we never checked this stuff, but there was some fishy stuff going on, right? And then the question would be, what did Hastings know? What did Gold know? Does it matter that the fishy stuff, if you will, was in your possession? That is, the very thing that caused your client to go and dig were inconsistencies in the invoices, in the verification, the paperwork that Kingsgarden had submitted. But those inconsistencies, at least according to your client's complaint against Innovative, dated further back than just the June invoice. So is that what you're talking about? Did they have it in their possession? Like maybe we don't have a confidential witness saying we know, but if the documents are right there, is that enough? Well, no. I mean, you have to have someone on that construction team who is more than just negligent. You had to have someone on that construction team who was thinking fraud. There's no pleading of that. So it's not enough. I mean, it's like all of these cases say, mismanagement is not enough. Negligence is not enough. Can I ask you a question? Sure. You started, I mean, I'm just a little bit confused. You started today by pointing to Blue Orca Report and your press release, I believe, that were appended to. Not our press release, our lawsuit. Oh, all right. Okay. Why is the Blue Orca Report, you said it's an admission or something to the plaintiffs? Why is that? Any document. I understand. It's all incorporated into the complaint. How is that? What exactly do we take from that? I get it. But why is that so damning, as it were? You mean to the plaintiffs? Yes. Yeah, because the first thing it says is, this is our opinion. And then it goes into these lawsuits and says, we don't know if these facts are true. There's been no judgment. We don't know if Michael King is a good witness. Oh, all right. Okay. Yeah. Can I ask you about, we talked to your friends about whether they preserve the corporate scienter. Maybe you could address that. Yeah, well, I would say no. I don't think it's in their response to our motion to dismiss. So that's where I don't see it. I could be wrong about that, but I kind of looked at that issue and I did not see it. So is your argument that even if it's developed, it was only developed before our court, not properly put before the district court? Correct. Okay. Then, if you look in the reply brief, in their opening brief, I don't think they cite the record about it. But if you look in their reply brief, where they raise it again, they do cite the record. But when I look at those citations, I don't see those citations raising a corporate scienter issue. So in that regard, I would think it's... They could raise corporate scienter without citing to the record, though, couldn't they? Without specifically citing to the record, they could raise corporate... I'm not saying they did, but couldn't they raise it? Well, sure. But what good does that do? I mean, if they cannot support it with the record... Yeah, we just go to the issue of waiver or forfeiture. I mean, yeah. I mean, I think I hear these opinions from the courts all the time. We're not going to scour the record to find support for your legal arguments. So that's why I looked at those record sites, and I just didn't see it. Can I also ask you about the effect of having Hastings as the contact person in your press release?  What does that show? I mean, you heard what our discussion was on that. Yeah. I'm afraid I keep coming back to the language I see in these cases is that you've got to have specific knowledge communicated. But are the statements in the press release all imputable to Hastings because she's the contact? Oh, I don't think that that's true. No, just because she's the contact. I think there's got to be some evidence of a communication. Go say this. I guess if you look at some of those corporate center cases, I think you get that idea. One of the theories, as I understand it, is that there's some corporate agent who's putting information into a public statement and saying, go say this. And I don't see that pleading. Okay. Thank you, counsel. And we'll hear rebuttal. With respect to corporate center, we cite 825, which is Her Honor's opinion, rejecting the corporate center argument. That's in footnote 29, I think it is. The defendants have waived their waiver argument. They didn't address corporate center at all. They ignored it. I'd like, if I may, to repeat what I said earlier. You've got three minutes, so you can spend it the way you want. I do, but this is very important because my friend keeps referring, he does in his brief, to confidential sources in Avaya. Avaya says a complaint can meet the pleading requirement of the PSLRA by providing sufficient documentary evidence and or sufficient description of personal sources. And then what this court did in Avaya was it found falsity based on the confidential sources. But I'm reading directly from the opinion now, and this is very important. It is true that the shareholders do not point to any particular document or conversation that would have informed Peterson McGuire of unusual discounting during this class period. My friend keeps telling you that Avaya relied on confidential sources. With respect to Sienter, it did not. It simply did not. What it relied on was that when someone raises an issue, a pointed issue that is material, that is important to the corporation, which this was, this questioned everything about the due diligence they did and the verifications that they approved and their verification process. When you do that and someone unequivocally unhedged denies, what this court said was they are creating the risk, the risk of misleading investors even if they don't know. That's right in Avaya. And May 5th is so much worse than the March 2nd to March 10th Avaya example. They had three days, and by the way, in Avaya, remember, the defendants at the end of the class period, they said, we got hit in the last week of the quarter. And this court in the face of that statement said, without confidential witness and without document, this court said, if you deny unhedged, and our defendants here did twice, if you deny unhedged, you are creating, you're recklessly creating a risk of deceiving investors. There is no daylight between this case and Avaya. I want to say one more thing in 19 seconds, please. The only argument they have with respect to due diligence is that they did not say that they were investigating the management team. That is absolutely false, and I commend you to page 313 of the record, where with respect to Kingsgarden, Mr. Reagan and Mr. Gold, several times in that conference call, but especially on 313, say publicly, we do an in-depth investigation of the management team, an in-depth review of the management team, which parrots what Mr. Gold said on August 5th of 2021. Judge Montgomery-Reeves, you had raised that point earlier. It's at the top of the page if you're on 313. You had raised that point earlier, Judge Montgomery-Reeves. Why isn't this about Sozo and Temescal? What we know from May 5th is it's not. It's portfolio-wide, which means that our friends have conceded two things. One, they didn't tell the truth. It is public, and they said they did these reviews of management team. And, two, they have no scienter argument at all. So this court should reverse on the due diligence prior to April 14th, if nothing else, and then from April 14th, 2022 on, because a via is determinative. Okay. Thank you, counsel. Thank you. We thank counsel for their excellent briefing and arguments today. We'd ask counsel to order a transcript of this argument and split the cost, okay? But we thank counsel. We'll take the case under advisement. And I can't help but notice we've got a lot of young faces out here. Not you, lawyers. They're in the back of you. Sorry. Sorry about that. Yeah, that's true. But welcome. I hope you enjoyed listening to an appellate argument, and we thank you for your contributions this summer to our system of justice. And look forward to when you're taking these seats. My guess is, given how interesting this case is, some of you will consider dental school. And a special shout-out to Judge Shipp's clerks, interns who are here who came all the way over from Trenton. So thank you. But with that, I'll ask the clerk to introduce himself.